# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF VIRGINIA

### ALEXANDRIA DIVISION

NYJAH ROSS and THOMAS
CASTELLI, on behalf of themselves and
all others similarly situated,

       Plaintiffs,

v.

PENTAGON FEDERAL CREDIT
UNION and DOES 1 through 100,

       Defendants.

: : : : : : : : : : : : :

---

## CLASS ACTION COMPLAINT

---

Plaintiffs, Nyjah Ross and Thomas Castelli ("Plaintiffs"), by their attorneys, hereby bring this class action against Pentagon Federal Credit Union and DOES 1 through 100 (collectively "Pentagon Federal" or "Defendant").

### NATURE OF THE CLASS ACTION

1.     All allegations herein are based upon information and belief except those allegations which pertain to Plaintiffs or their counsel.  Allegations pertaining to Plaintiffs or their counsel are based upon, *inter alia*, Plaintiffs' or their counsel's personal knowledge, as well as Plaintiffs' or their counsel's own investigation.  Furthermore, each allegation alleged herein either has evidentiary support or is likely to have evidentiary support, after a reasonable opportunity for additional investigation or discovery.

2.     This is a class action brought by Plaintiffs to assert claims in their own right and in their capacity as the class representatives of all other persons similarly situated.  As set forth herein, Pentagon Federal wrongfully charged Plaintiffs and the Class members overdraft fees and

1

Non-Sufficient Funds fees.

3.      This class action seeks monetary damages, restitution, and injunctive relief due to, *inter alia*, Pentagon Federal's policy and practice of assessing an overdraft fee or NSF fee on transactions when there was enough money in the checking account to cover (pay for) the transactions presented for payment. The charging of such overdraft fees breaches Pentagon Federal's contracts with its members, who include Plaintiffs and the members of the Class. This class action also seeks monetary damages, restitution, and injunctive relief due to Pentagon Federal's policy and practice of charging multiple Non-Sufficient Funds Fees ("NSF fees") on the *same* electronic transaction, a practice which also violates Pentagon Federal's contracts with its members, who include Plaintiffs and the members of the Class.

4.      The charging for such overdraft fees also violates federal law. Pentagon Federal failed to follow basic prerequisites in its overdraft fee system as required by Regulation E (12 C.F.R. §§1005.17 *et seq.*) of the Electronic Fund Transfer Act (15 U.S.C.A. §§ 1693 *et seq.*), which include, *inter alia*, providing a separate overdraft fee contract that describes the actual overdraft and non-sufficient funds practice used by Pentagon Federal, which may be rejected by the customer, and only collecting fees in the manner described by the fee contract. Regulation E prohibits Pentagon Federal from assessing overdraft fees for automated teller machine (ATM) and non-recurring debit card transactions (12 C.F.R. §1005.17(b)(1)(i)) if it does not meet the Regulation E prerequisites, but Pentagon Federal did charge overdraft fees without meeting the Regulation E prerequisites.

## PARTIES

5.      Plaintiff Nyjah Ross is a resident of Landover, Maryland, and was a member of Pentagon Federal at all times relevant to the class action allegations.

6.      Plaintiff Thomas Castelli is a resident of Westminster, Maryland, and was a member of Pentagon Federal at all times relevant to the class action allegations.

7.      Based on information and belief, Defendant Pentagon Federal is and has been a federally chartered credit union with its headquarters located in McLean, Fairfax County,

Virginia. Pentagon Federal is a "financial institution" within the meaning of Regulation E (12 C.F.R. § 1005.2(i)).

8.      Without limitation, Defendants DOES 1 through 100, include agents, partners, joint ventures, subsidiaries and/or affiliates of Pentagon Federal and, upon information and belief, also own and/or operate Pentagon Federal branch locations. Each of Defendants DOES 1 through 100 is a "financial institution" within the meaning of Regulation E (12 C.F.R. § 1005.2(i)). As used herein, where appropriate, the term "Pentagon Federal" is also inclusive of Defendants DOES 1 through 100.

9.      Plaintiffs are unaware of the true names of Defendants DOES 1 through 100. Defendants DOES 1 through 100 are thus sued by fictitious names, and the pleadings will be amended as necessary to obtain relief against defendants DOES 1 through 100 when the true names are ascertained, or as permitted by law or by the Court.

10.      There exists, and at all times herein mentioned existed, a unity of interest and ownership between the named Defendants (including DOES) such that any corporate individuality and separateness between the named Defendants has ceased, and that the named defendants are *alter egos* in that the named Defendants effectively operate as a single enterprise, or are mere instrumentalities of one another.

11.      At all material times herein, each Defendant was the agent, servant, co-conspirator and/or employer of each of the remaining Defendants, acted within the purpose, scope, and course of said agency, service, conspiracy and/or employment and with the express and/or implied knowledge, permission, and consent of the remaining Defendants, and ratified and approved the acts of the other Defendants. However, each of these allegations are deemed alternative theories whenever not doing so would result in a contradiction with the other allegations.

12.      Whenever reference is made in this Complaint to any act, deed, or conduct of Defendant, the allegation means that Defendant engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees, or representatives who was

#11221105.2

actively engaged in the management, direction, control, or transaction of Defendant's ordinary business and affairs.

13.     As to the conduct alleged herein, each act was authorized, ratified or directed by Defendant's officers, directors, or managing agents.

## VENUE AND JURISDICTION

14.     This Court has subject matter jurisdiction over this case, among other reasons, pursuant to 28 U.S.C. § 1332(d).

15.     Venue is proper in this District, among other reasons, pursuant to 28 U.S.C. § 1391(b)(1) because Defendant is a resident of this District.

## FACTUAL ALLEGATIONS

16.     Pentagon Federal is a credit union with approximately 48 branches located in more than 10 states, with over 1.8 million members, and holding approximately $25 billion in assets, and on information and belief is the third largest credit union in the country. Pentagon Federal offers its consumer banking customers a checking account. One of the features of a Pentagon Federal checking account is a debit card, which can be used for a variety of transactions including the purchasing of goods and services. In addition to receiving a debit card, other features of a Pentagon Federal checking account include: the ability to write checks; withdraw money from ATMs; schedule Automated Clearing House (ACH) transactions (certain recurring payments); and other types of transactions that debit from a checking account.

17.     In connection with its processing of debit transactions (debit card, ATM, check, ACH, and other similar transactions), Pentagon Federal assesses overdraft fees and NSF fees to customer accounts when it claims to have determined that a customer's account has been overdrawn.

18.     Overdraft fees and NSF fees constitute the primary fee generators for banks and credit unions. In 2009 alone, banks generated an estimated $37 billion from overdraft fees on debit purchases and ATM transactions. While credit unions portray themselves to customers as more overdraft and fee friendly than banks, a 2015 study conducted by Moebs Services

confirmed that the median overdraft fees charged by credit unions are not statistically significantly less than the median overdraft fees charged by banks. For credit unions such as Pentagon Federal, overdraft fees and NSF fees are a major source of revenue and a profit center. According to a 2010 report by Georgetown University Law Professor Adam Levitin, overdraft fees comprise 6% to 7% of the gross revenue of credit unions. (Filene Research Institute Report, Overdraft Regulation A Silver Lining In The Clouds? Filene Research Institute 2010).

19.     The high cost of an overdraft fee is usually unfairly punitive. In a 2012 study, more than 90% of customers who were assessed overdraft fees overdrew their account by mistake. (May 2012 Pew Charitable Trust report entitled "Overdraft America: Confusion and Concerns about Bank Practices", at p. 4). More than 60% of the transactions that resulted in a large overdraft fee were for less than $50. (June 2014 Pew Charitable Trust report entitled "Overdrawn", at p. 8). More than 50% of those who were assessed overdraft fees do not recall opting into an overdraft program (*id.* at p. 5), and more than two-thirds of customers would have preferred the financial institution decline their transaction rather than paying the transaction into overdraft and charging a very large fee (*id.* at p. 10).

20.     Unfortunately, the customers who are assessed these fees are the most vulnerable customers. Younger, lower-income, and non-white account holders are among those who were more likely to be assessed overdraft fees. (*Id.* at p. 1). A 25-year-old is 133% more likely to pay an overdraft penalty fee than a 65-year-old. (*Id.* at p. 3). More than 50% of the customers assessed overdraft fees earned under $40,000 per year. (*Id.* at p. 4). Non-whites are 83% more likely to pay an overdraft fee than whites. (*Id.* at p. 3).

21.     As a result of banks and credit unions taking advantage of millions of customers through the unfair practice of charging overdraft fees through methodologies that maximize the possible number of expensive overdraft fees to be charged, there has been a substantial amount of litigation over the past few years. The outcome of these cases has predominantly fallen in favor of plaintiffs with the banks and credit unions repaying their customers over one billion

dollars for the unlawfully assessed overdraft fees by way of jury verdicts and settlements.[1]

22.    The federal government has also stepped in to provide additional protections to customers with respect to abusive overdraft policies. In 2010, the Federal Reserve Board enacted regulations giving financial institutions the authority to charge overdraft fees on ATM and one-time debit card transactions only if the institution first obtained the affirmative consent of the customer to do so. (12 C.F.R. § 1005.17 (Regulation E's "Opt-In Rule")).

23.    To qualify as affirmative consent, the Opt-In Contract must include, but is not limited to the following:

- The customer must be provided the overdraft policy, including the dollar amount of any fees that will be charged for an overdraft, and the maximum number of fees that can be assessed on any given day (if there is no maximum, that fact must be stated);

- The financial institution must state whether alternatives, such as linking the checking account to a secondary account or line of credit, are available.

- The opt-in consent must be obtained separately from other consents and acknowledgements;

- The consent cannot serve any purpose other than opting into the overdraft program;

- The consent cannot be a pre-selected checked box;

- The financial institution may not provide different terms for the account depending on whether the customer opted in to the overdraft program.

If the financial institution does not obtain proper, affirmative consent from the customer that meets all of the requirements of Regulation E's Opt-in Rule, including fulfilling each of the

---

[1] http://files.consumerfinance.gov/f/documents/CFPB_Arbitration_Agreements_Notice_of_Prop osed_ Rulemaking.pdf, at p. 74-75.

above requirements, then it is not permitted to charge overdraft fees on ATM and one-time debit card transactions. On information and belief, although formal discovery will be required to confirm this, to the extent that Pentagon Federal engages in a Reg E overdraft program, Pentagon Federal did not fulfill these prerequisites.

24.    Further, at all relevant times, on information and belief, Pentagon Federal has had an overdraft program in place for assessing overdraft fees which, *inter alia*, is: (1) contrary to the express and implied terms of its contract with members; (2) contrary to Pentagon Federal's representations about its overdraft program to its members; and (3) contrary to its members' expectations regarding the assessment of overdraft fees.

25.    There are three balances in an account: the "balance;" the "collected available balance;" and, the "artificial available balance." The "balance" (sometimes called the "actual balance" or "ledger balance") is the money in the account, without deductions for holds on pending transactions or on deposits. It is the official balance of the account. It is the balance provided to the customer in monthly statements, which is the official record of activity in the account. It is the balance used to determine interest on deposits and any minimum balance requirements. Further, based on information and belief, it is the balance which is used by Defendant Pentagon Federal to report its deposits to regulators, shareholders and the public. It is the balance provided to regulators in call reports and reserve reports. It is the balance used in financial reports to shareholders and the balance used for internal financial reporting. It is the balance used by credit reporting agencies in providing credit ratings of Pentagon Federal.

26.    The "collected available balance" is the "balance" less holds placed on certain deposits pursuant to the financial institution's "Funds Availability Policy" ("FAP"). Regulation CC (12 CFR Part 229) establishes maximum permissible hold periods for checks and other deposits and all financial institutions are required by it to have an FAP.

27.    The "artificial available balance" is a completely different calculation than the "collected available balance." Although the "artificial available balance" has the words "available balance" in it like the "collected available balance" does, the "artificial available

balance" is an accounting gimmick which takes the "collected available balance" and then further deducts from it pending debit card transactions which have not yet posted (and which might or might not ever post), meaning the money is still in the account of the credit union member.

28.     Therefore, when a financial institution states it will only charge an overdraft or NSF when there is a "negative balance" in the account, it cannot mean this would be after deduction of holds on deposits or debit card transactions as this would be self-contradictory.

29.     Another accounting gimmick used by some financial institutions, which on information and belief financial institutions such as Defendant may use, is an "approve positive – post negative" method of calculation. This would mean while there are sufficient funds in the customer's account to cover the transaction in question even under Defendant's own improper method of calculating the balance, the Defendant then places an immediate hold on the funds involved in the subject transaction and sets them aside, not allowing the amount held to be counted as available for any other transactions. But when using this gimmick a Defendant will nonetheless charge an overdraft fee if at the time the transaction in question "posts" the balance, according to Defendant, is supposedly in the negative. In other words, even though Defendant has set aside the specific funds at issue in the subject transaction at the time of the authorization of the transaction, and not allowed them to be used for any other purposes, Defendant nonetheless will charge an overdraft or NSF fee on that same transaction if intervening transactions have brought the balance down to a level which the held transaction would now bring into the negative.

30.     Upon information and belief, Pentagon Federal collects overdraft and NSF fees based on the "artificial available balance" and/or the "approve positive – post negative" calculation without contracting to this with its members in its contracts. There is no requirement to use the "artificial available balance" or the "approve positive – post negative" calculation, and during the Class Period Pentagon Federal had no authority or disclosure or statement in any of its contracts with its members that it would use the "artificial available balance" or the "approve

positive – post negative" calculation for purposes of assessing overdraft fees.

31.    Not only is the practice of using the "artificial available balance" or "approve positive – post negative" calculation to determine whether a transaction results in an overdraft or NSF fee contrary to Pentagon Federal's contracts with its members during the Class Period, but such practices have resulted in Pentagon Federal improperly charging unlawful overdraft and NSF fees.

32.    Pentagon Federal entered into a written contract with Plaintiffs and the other Class Members titled "Membership Disclosures" (hereinafter referred to as the "Account Agreement"), which is attached hereto as Exhibit 1.  The Account Agreement contains a promise that an overdraft only occurs, and an overdraft fee will only be charged, "should we decline to pay the item or pay the item, creating a negative balance on my account." It is undisputable that the Account Agreement never states anywhere that holds will be placed on funds in the account for pending debit card transactions, and that those funds will be subtracted from the member's "balance" to instead create an "artificial available balance" for the purpose of determining overdraft or NSF fees.  It is further undisputable that nowhere does the Account Agreement define "sufficient funds" or "adequate funds" in any manner, let alone as an "artificial available balance." Nor does Pentagon Federal's Account Agreement describe a situation where the "approve positive – post negative" method of calculation would be used to determine the balance available to be drawn upon.

33.    At best for Pentagon Federal there might be an arguable ambiguity as to whether Pentagon Federal somehow implied it was allowed to use "collected available balance" rather than "balance" for purposes of assessing overdraft and NSF fees, but under no circumstances is there even an implication that it could use the "artificial available balance" for this purpose.

34.    A second contract was also required for Pentagon Federal to collect overdraft fees on certain types of transactions.  Specifically, Pentagon Federal was required by Regulation E to provide an Opt-In Contract to Plaintiff and Class members which governs the terms under which Pentagon Federal may assess Plaintiff and Class members overdraft fees for ATM and non-

recurring debit card transactions, and must obtain their affirmative agreement to the contract before being allowed to charge overdraft fees for these debit card and ATM transactions. On information and belief, to the extent that Pentagon Federal engaged in a Regulation E overdraft program, it did not comply with Regulation E's requirements.

35.     The importance of Regulation E is highlighted by the fact that the Consumer Financial Protection Bureau's study of actual practices found that: (1) ATM and debit card transactions are by far the most frequent transactions that occur; (2) overdraft fee policies entail expensive fees at very little risk to the financial institutions; and (3) opted-in accounts have seven times as many overdrafts that result in fees as not opted-in accounts.[2]

36.     On information and belief, Pentagon Federal does not have a separate opt-in contract that meets the requirements of Regulation E, including, *inter alia*, an adequate description of Pentagon Federal's actual practice for applying overdraft fees. Such a description would include a description of the use of an "artificial available balance" rather than just a "balance" or "collected available balance."

37.     In fact, Pentagon Federal charges overdraft and NSF fees when the balance contains as much or more money than has been requested, but some subset of the balance does not. Pentagon Federal's practice of charging overdraft and NSF fees, even when there is enough money in the account to cover a transaction presented for payment, is inconsistent with how Pentagon Federal's Account Agreement expressly describes the circumstances under which overdraft and NSF fees are assessed.

38.     Pentagon Federal also has an improper practice of charging multiple NSF fees for the same electronic item. Pentagon Federal charges a $30 fee when an electronic item is first processed for payment and Pentagon Federal determines that there is not enough money in the account to cover the item (a practice that on information and belief uses the wrong "balance" to make the determination as described above). Pentagon Federal then charges an *additional* NSF

---

[2] http://files.consumerfinance.gov/f/201407_cfpb_report_data-point_overdrafts.pdf

fee if the same item is presented for processing again, even though the account holder took no action to resubmit the transaction for payment. This violates the Account Agreement, *inter alia*, at page 5 which states:

> A fee will be assessed for non-sufficient funds or uncollected funds (deposits on hold); refer to the Service Fees available at Pentagon Federal.org for the amount of this fee. This fee applies to withdrawals by means of a check, ACH debit, or an electronic debit. This fee will be assessed should we decline to pay the item or pay the item, creating a negative balance on my account. Pentagon Federal in its sole discretion will decide whether to pay an item thus creating a negative balance on my account.

In other words, the Account Agreement drafted by Defendant itself states singular "a **fee** will be assessed" not plural "**multiple fees** will be assessed." Further, it also states "should we decline to pay **the item** or pay **the item**." "The item" means a single electronic transaction, and a re-presentment" or a "retry" of an "item" does not change it into a new or different "item." It is still the same "item" being presented by the same merchant in the same dollar amount, not a new "item." An electronic item reprocessed after an initial return for insufficient funds, especially through no action by the customer, cannot and does not fairly become a new, unique additional "item" for fee assessment purposes.

39.    Furthermore, the term "item" is not defined in Pentagon Federal's Account Agreement. Nowhere does the Account Agreement state it would be "for each presentment of the item" or "per presentment of the item." It does not even have an adjective such as "debit" in front of the word "item" to arguably create an ambiguity against the customer's interpretation.

40.    Pentagon Federal's Fee Schedule is attached as Exhibit 2 and states that this NSF charge is "per item:"

| Non-Sufficient Funds (NSF) Fee | $30 per item |
|---|---|

It is Plaintiffs' position that at all times the NSF Fee was described as "$30 per item" it is not even reasonably arguable by Defendant that there was an ambiguity which allowed Defendant to charge $30 per each presentment of the same item." At best for Defendant in this case, at some

point in the future, an ambiguity arguably might have arisen when Defendant changed its language in the Fee Schedule to instead state as follows:

> Returned ACH (Originated at another financial institution),
> Check, or Preauthorized Debit
>     Non-sufficient Funds                    $30.00

(Exhibit 3.) Under the above later-implemented adhesion language which dropped the words "per item," Defendant might at best argue that it may be ambiguous as to whether it was allowed to charge an NSF fee for the same identical item more than once (even though the Account Agreement strongly implies otherwise). But at the time Defendant used the words "per item," Defendant cannot even argue credibly that there was an ambiguity, yet alone authority, which allowed it to charge multiple NSF fees for the same item every time the item was re-presented.

41.     Of note, many financial institutions that do engage in this same or similar abusive practice of charging repeat NSF fees for the same "item" at least at a minimum make this clear in their Account Agreements or Fee Schedules, unlike Defendant. They typically use the terminology such as "per presentment" or "per each presentment" to make this clear, and often also add far more in explaining this to be sure it not ambiguous.

42.     For example, Air Academy Federal Credit Union contracts its NSF fee as "$32.00 **per presentment**." (emphasis added)   https://www.aafcu.com/fees.html

43.     Central Pacific Bank contracts unambiguously:

> Items and transactions (such as, for example, checks and electronic transactions/payments) returned unpaid due to insufficient/non-sufficient ("NSF") funds in your account, **may be resubmitted one or more times for payment, and a $32 fee will be imposed on you each time an item and transaction resubmitted for payment is returned due to insufficient/nonsufficient funds**. (emphasis added)

(https://www.cpb.bank/media/1618/fee-001-rev-10-24-2019-misc-fee-schedule.pdf)

44.     Delta Community Credit Union contracts its NSF fee as "$30 **per presentment**." (emphasis added)   https://www.deltacommunitycu.com/home/fees.aspx . Further, in its Account

Agreement, Delta unambiguously states as follows:

> The Credit Union reserves the right to charge you an overdraft/insufficient funds fee if you write a check or initiate an electronic transaction that, if posted, would overdraw your Checking Account.  **Note that you may be charged an NSF fee each time a check or ACH is presented to us, even if it was previously submitted and rejected**. (emphasis added)  (https://www.deltacommunitycu.com/home/forms/member-savings-services-disclosures-and-agreements.aspx

45.    Glendale Federal Credit Union lists their NSF fee as "$30 **per presentment**."

(emphasis added)   https://glendalefcu.org/pdf/fees.pdf

46.    First Financial Bank contracts unambiguously:

> Merchants or payees may present an item multiple times for payment if the initial or subsequent presentment is rejected due to insufficient funds or other reason (representment). **Each presentment is considered an item and will be charged accordingly**." (emphasis added)

(https://www.bankatfirst.com/content/dam/first-financial-bank/eBanking_Disclosure_of_Charges.pdf)

47.    First Northern Credit Union lists their NSF fee as "$22.00 **per each presentment and any subsequent representment(s)**."  (emphasis added)

https://www.fncu.org/feeschedule/?scpage=1&scupdated=1&scorder=-click_count . Further, in

its Account Agreement, First Northern unambiguously states as follows:

> You further agree that **we may charge a NSF fee each time an item is presented for payment even if the same item is presented for payment multiple times**.  For example, if you wrote a check to a merchant who submitted the payment to us and we returned the item (resulting in a NSF fee), the merchant may re-present the check for payment again.  If the second and any subsequent presentments are returned unpaid, **we may charge a NSF fee for each time we return the item.  You understand this means you could be charged multiple NSF fees for one check** that you wrote as that check could be presented and returned more than once. **Similarly**, if you authorize a merchant (or other individual or entity) to electronically debit your account, such as an ACH debit, **you understand there could be multiple submissions of the electronic debit request which could result in multiple NSF fees**.  (emphasis added) (https://www.fncu.org/SecureAsset.aspx?Path=/7/Member_Agreement_November_1_2019.pdf)

48.    Klein Bank contracts unambiguously:

[W]e will charge you an NSF/Overdraft Fee each time: (1) a Bill Payment (electronic or check) is submitted to us for payment from your Bill Payment Account when, at the time of posting, your Bill Payment Account is overdrawn, would be overdrawn if we paid the item (whether or not we in fact pay it) or does not have sufficient available funds; or (2) we return, reverse, or decline to pay an item for any other reason authorized by the terms and conditions governing your Bill Payment Account. **We will charge an NSF/Overdraft Fee** as provided in this section **regardless of the number of times an item is submitted or resubmitted to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the bill payment.** (emphasis added)

(kleinbankonline.com/bridge/disclosures/ib/disclose.html)

49.    Liberty Financial contracts its NSF fee as "$27.00 **per presentment**."

https://liberty.financial/about/fee-schedule/  (emphasis added)

50.    Los Angeles Federal Credit Union lists its NSF fee as "$29 **per presentment**."

https://www.lafcu.org/pdf/currentfees_bus.pdf (emphasis added)

51.    Members First Credit Union contracts unambiguously:

We reserve the right to charge an Non-Sufficient Funds Fee (NSF Fee) each time a transaction is presented if your account does not have sufficient funds to cover the transaction at the time of presentment and we decline the transaction for that reason. **This means that a transaction may incur more than one Non-Sufficient Funds Fee (NSF Fee) if it is presented more than once…we reserve the right to charge a Non-Sufficient Funds (NSF Fee) for both the original presentment and the representment** [.] (emphasis added)

(http://www.membersfirstfl.org/files/mfcufl/1/file/Membership_and_Account_Agreement.pdf)

52.    Meriwest Credit Union lists its fee as "$35.00/item **per presentment**". (emphasis added)  https://www.meriwest.com/sites/www.meriwest.com/files/media/consumer_feesched.pdf

53.    Partners 1st Federal Credit Union contracts unambiguously:

Consequently, because **we may charge a fee for an NSF item each time it is presented, we may charge you more than one fee for any given item**. Therefore, multiple fees may be charged to you as a result of a returned item and resubmission regardless of the number of times an item is submitted or resubmitted to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the item. (emphasis added)

(https://www.partners1stcu.org/uploads/page/Consumer_Account_Agreement.pdf)

54.    Regions Bank contracts unambiguously:

If an item is presented for payment on your account at a time when there is an insufficient balance of available funds in your account to pay the item in full, you agree to pay us our charge for items drawn against insufficient or unavailable funds, whether or not we pay the item. **If any item is presented again after having previously been returned unpaid by us, you agree to pay this charge for each time the item is presented for payment and the balance of available funds in your account is insufficient to pay the item**. (emphasis added)

(https://www.regions.com/virtualdocuments/Deposit_Agreement_6_1_2018.pdf)

55.    Tyndall Federal Credit Union lists its NSF fee as "$28.00 **per presentment** (maximum 5 per day)." https://tyndall.org/member_center/document_center/fee_schedule

56.    USE Credit Union states "**Fees are charged per presentment, meaning the same item is subject to multiple fees if presented for payment multiple times**." (emphasis added)   (https://www.usecu.org/home/fiFiles/static/documents/Schedule_of_Fees.pdf)

57.    Therefore, if Pentagon Federal wanted to engage in this abusive practice, it at least was required to state and contract so, as these other financial institutions all do. All of these quotations show that the banking and credit union industry differentiate between an "item" and a "presentment" of an item when calculating NSF fees. Pentagon Federal does not use the term "presentment" in its Account Agreement, but instead says it will only charge a fee per "item." However, in practice Pentagon Federal charges the fee per "presentment," not per "item."

58.    Pentagon Federal's practice of charging multiple NSF fees for a single electronic transaction is particularly egregious because, as described, Pentagon Federal assesses such fees using an improper calculation of the balance available in a member's account (the "artificial available balance"), causing additional confusion and ambiguity.  Pentagon Federal often charges an overdraft or NSF fee improperly, and that improper $30 deduction from a member's balance further decreases the "balance," generating even more NSF fees or overdraft fees.

59.    Plaintiffs and Class members have performed all conditions, covenants, and promises required by each of them in accordance with the terms and conditions of the contracts.

60.    Plaintiffs did not and could not have, exercising reasonable diligence, discovered both that they had been injured and the actual cause of that injury until they met with their attorneys in or about February 2020. This not only reasonably delayed discovery, but Defendant's affirmative representations and actions also equitably toll any statute of limitations, and, also additionally equitably estop Defendant.

61.    Therefore, Plaintiffs, on behalf of themselves and all others similarly situated, seeks relief as set forth below.

62.    Plaintiffs were harmed by Defendant's policy and practice of charging multiple fees on the same item. As stated, Plaintiffs entered into contracts with Pentagon Federal during the relevant class periods wherein Pentagon Federal contracted to charge overdraft fees or NSF fees only if there were insufficient funds to pay the item, and only to charge an NSF "fee" (singular) for an "item" (not "per each presentment of the item"). Pentagon Federal breached its contracts with Plaintiffs by charging multiple NSF fees on the same item, and by charging overdraft or NSF fees when there was enough money in the account to cover the transaction. It will be necessary to obtain Defendant's records to determine each instance of such a wrongful overdraft fee. However, to give one example, on January 26, 2016, Plaintiff Ross was charged a $30 "NSF Fee" for a debit item of $6.98 when, according to Defendant, there supposedly were insufficient funds in the account to cover the item. A few days later, Pentagon Federal again charged an additional $30 "NSF Fee" when it resubmitted the same $6.98 item again, thereby charging $60 in multiple NSF fees for the same single $6.98 item. To give another example, on July 28, 2016, Plaintiff Castelli was charged a $30 "NSF Fee" for a debit item of $146.60 when, according to Defendant, there supposedly were insufficient funds in the account to cover the item. A few days later, Pentagon Federal again charged an additional $30 "NSF Fee" when it

resubmitted the same $146.60 item again, thereby charging $60 in multiple NSF fees for the same single $146.60 item.

63.    Plaintiffs have a reasonable belief that a complete review of Plaintiffs' and Pentagon Federal's records will show multiple instances in which Plaintiffs were charged multiple NSF fees for the same electronic transaction, and/or were charged fees when there was enough money in the account to cover the transaction, even though Pentagon Federal's Account Agreement states that a "fee" will only be charged when "an item" cannot be paid because there is not enough money in the member's account. A resubmission of the same item or transaction does not create a new "item," and cannot result in an additional NSF fee, pursuant to Pentagon Federal's own contracts. Further, holds on pending deposits or transactions do not mean the account is in a "negative balance" as Pentagon federal states on page 5 of its Account Agreement.

64.    Moreover, the assessment and unilateral taking of improper overdraft fees further reduces the balance and amount of funds in the account, resulting in and aggressively causing subsequent, otherwise non-overdraft transactions to be improperly treated as transactions for which Pentagon Federal assesses further overdraft or NSF fees. This practice was deemed to be deceptive and substantially harmful to customers by the CFPB, which made the following conclusions in its studies:

> Examiners also observed at one or more institutions the following sequence of events after the institutions switched balance-calculation methods: a financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to

> consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive.

(*Infra,* Supervisory Highlights, Winter 2015, at pp. 8-9.)   A complete evaluation of Pentagon Federal's records is necessary to determine the full extent of Plaintiffs' harm from this practice.

65.    Additionally, because Account Agreement did not describe Pentagon Federal's actual overdraft service, and/or because it contained other deficiencies, to the extent that Pentagon Federal engaged in a Regulation E overdraft program, if at all, Pentagon Federal violated Regulation E by charging overdraft fees on ATM and non-recurring debit card transactions.  Because it failed to provide the full and accurate disclosures to Plaintiffs required by Regulation E, Pentagon Federal failed to obtain Plaintiffs' fully informed consent as required by Regulation E in order for Pentagon Federal to be authorized to charge such overdraft fees. Because Pentagon Federal was not legally authorized to enroll Plaintiffs into the program for non-recurring debit card and ATM transactions, Pentagon Federal violated Regulation E when it assessed any overdraft fees against Plaintiffs for non-recurring debit card and ATM transactions.

66.    Plaintiffs were harmed by these practices when they were assessed overdraft fees and NSF fees when they should not have been. A complete evaluation of Pentagon Federal's records is necessary to determine the full extent of Plaintiffs' harm from this practice as well.

## CLASS ACTION ALLEGATIONS

67.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

68.    Plaintiffs bring this case, and each of their respective causes of action, as a class action pursuant to Federal Rule of Civil Procedure 23(a)(b)(1), (b)(2) and (b)(3) on behalf of the

following Class.

69.    The "Class" is composed of three classes:

**The Repeat NSF Class:**

> **All United States residents who have or have had accounts with Pentagon Federal who incurred an NSF fee more than once for the same item during the period beginning five years preceding the filing of this Complaint and ending on the date the Class is certified.**

**The Account Balance Class:**

> **All United States residents who have or have had accounts with Pentagon Federal who incurred an overdraft fee or NSF fee when the balance in the checking account was sufficient to cover the transaction at issue during the period beginning five years preceding the filing of this Complaint and ending on the date the Class is certified.**

**The Regulation E Class:**

> **All United States residents who have or have had accounts with Pentagon Federal who incurred an overdraft fee or overdraft fees for ATM or non-recurring debit card transaction(s) during the period beginning August 15, 2010 and ending on the date the Class is certified.**

70.    Excluded from the Class are: (1) any entity in which Defendant has a controlling interest; (2) officers or directors of Defendant; (3) this Court and any of its employees assigned to work on the case; and (4) all employees of the law firms representing Plaintiffs and Class members.

71.    This action has been brought and may be properly maintained on behalf of each member of the Class pursuant to Federal Rule of Civil Procedure 23.

72.    **<u>Numerosity</u>** – The members of the Class are so numerous that a joinder of all

members would be impracticable.  While the exact number of Class members is presently

unknown to Plaintiffs, and can only be determined through appropriate discovery, Plaintiffs

believe that the Class are likely to include thousands of members based on the fact that Pentagon

Federal has approximately $25 billion in assets and operates approximately 48 branches in over

10 states with over 1.8 million members.

73.     Upon information and belief, Defendants have databases, and/or other

documentation, of its customers' transactions and account enrollment.  These databases and/or

documents can be analyzed by an expert to ascertain which of Pentagon Federal's members have

been harmed by its practices and thus qualify as Class members.  Further, the Class definition

identifies groups of unnamed plaintiffs by describing a set of common characteristics sufficient

to allow a member of that group to identify himself or herself as having a right to recover.  Other

than by direct notice by mail or email, alternatively proper and sufficient notice of this action

may be provided to the Class members through notice published in newspapers or other

publications.

74.     **Commonality** – This action involves common questions of law and fact.  The

questions of law and fact common to both Plaintiffs and Class members include, but are not

limited to, the following:

a.      Whether, pursuant to the Account Agreement, Defendant

contracted that it would charge more than one NSF fee for the same item, each

time that same item was presented or re-presented;

b.      Whether, pursuant to the Fee Schedules, Defendant disclosed it

would charge more than one NSF for the same item, charging an NSF each time

the same item was re-presented;

c.    Whether the Account Agreement is ambiguous on the issue of how many NSF fees Defendant would charge for the same item or whether it stated a fee would be charged for each presentment of the same item;

d.    Whether the Fee Schedule was ambiguous on the issue of how many NSF fees Defendant would charge for the same item or whether it stated a fee would be charged for each presentment of the same item;

e.    Whether Defendant breached the Account Agreement by assessing overdraft fees or NSF fees for transactions when customers' checking accounts contained enough money to cover the transactions;

f.    Whether the language in the Account Agreement, and to the extent Defendant engaged in a Regulation E overdraft program that document, accurately described Defendant's overdraft service pursuant to which Defendant assessed overdraft fees.

75.    **Typicality** – Plaintiffs' claims are typical of all of the members of the Class.  The evidence and the legal theories regarding Defendant's alleged wrongful conduct committed against Plaintiffs and all of the Class members are substantially the same because all of the relevant agreements between Defendant and its customers, including the Account Agreement and Fee Schedules, were identical as to all relevant terms, and also because, *inter alia*, the challenged practices of charging customers for overdraft fees or NSF fees when there were sufficient funds in the accounts to pay for the transactions at issue, and of assessing multiple NSF fees for the same electronic item, are uniform for Plaintiffs and all Class members.  Accordingly, in pursuing their own self-interest in litigating their claims, Plaintiffs will also serve the interests of the other Class members.

76.    **Adequacy** – Plaintiffs will fairly and adequately protect the interests of the Class members. Plaintiffs have retained competent counsel experienced in class action litigation to ensure such protection.  There are no material conflicts between the claims of the representative Plaintiffs and the members of the Class that would make class certification inappropriate. Plaintiffs and their counsel intend to prosecute this action vigorously.

77.    **Predominance and Superiority** – The matter is properly maintained as a class action under Federal Rule of Civil Procedure 23(b)(3) because the common questions of law or fact identified herein and to be identified through discovery predominate over questions that may affect only individual Class members.  Further, the class action is superior to all other available methods for the fair and efficient adjudication of this matter.  Because the injuries suffered by the individual Class members are relatively small, the expense and burden of individual litigation would make it virtually impossible for Plaintiffs and Class members to individually seek redress for Defendant's wrongful conduct.  Even if any individual person or group(s) of Class members could afford individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed.  The class action device is preferable to individual litigation because it provides the benefits of unitary adjudication, economies of scale, and comprehensive adjudication by a single court.  In contrast, the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the party (or parties) opposing the Class and would lead to repetitious trials of the numerous common questions of fact and law.  Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.  As a result, a class action is superior to other available methods for the fair and efficient adjudication of this

controversy. Absent a class action, Plaintiffs and Class members will continue to suffer losses, thereby allowing Defendant's violations of law to proceed without remedy and allowing Defendant to retain the proceeds of their ill-gotten gains.

78.     Plaintiffs do not believe that any other Class members' interest in individually controlling a separate action is significant, in that Plaintiffs have demonstrated above that their claims are typical of the other Class members and that they will adequately represent the Class. This particular forum is a desirable forum for this litigation because Defendant resides in this District. Plaintiffs do not foresee significant difficulties in managing the class action in that the major issues in dispute are susceptible to class proof.

79.     Plaintiffs anticipate the issuance of notice, setting forth the subject and nature of the instant action, to the proposed Class members. Upon information and belief, Defendant's own business records and/or electronic media can be utilized for the contemplated notices. To the extent that any further notices may be required, Plaintiffs anticipate the use of additional media and/or mailings.

80.     This matter is properly maintained as a class action pursuant to Rule 23(b) of the Federal Rules of Civil Procedure in that:

    a.     Without class certification and determination of declaratory, injunctive, statutory and other legal questions within the Class format, prosecution of separate actions by individual members of the Class will create the risk of:

        1.     Inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the parties opposing the Class; or

        2.     Adjudication with respect to individual members of the Class,

which would as a practical matter be dispositive of the interests of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interests. The parties opposing the Class have acted or refused to act on grounds generally applicable to each member of the Class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Class as a whole.

b.  Common questions of law and fact exist as to the members of the Class and predominate over any questions affecting only individual members, and a class action is superior to other available methods of the fair and efficient adjudication of the controversy, including consideration of:

1.  The interests of the members of the Class in individually controlling the prosecution or defense of separate actions;

2.  The extent and nature of any litigation concerning controversy already commenced by or against members of the Class;

3.  The desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

4.  The difficulties likely to be encountered in the management of a class action.

## FIRST CAUSE OF ACTION
### (Breach of Contract)

81.  The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

82.  Plaintiff and each of the Class members entered into an Account Agreement, such

as attached hereto as <u>Exhibit 1</u>, with Defendant covering the subject of overdraft and NSF transactions. This contract was drafted by and is binding upon Defendant.

83. Nowhere did the Account Agreement state that Pentagon Federal would assess an additional NSF fee every time the same electronic item was re-presented for processing or submitted as a "retry." Pentagon Federal wrongfully treated a "retry" as a new and separate "item" in violation of the terms of the Account Agreement. This also contradicted its own Fee Schedule which said that an NSF fee would be "per item" not "per each presentment of an item."

84. Further, in the Account Agreement, Defendant promised that Pentagon Federal would assess overdraft or NSF fees only when there was a "negative balance." A "negative balance" does not mean holds on pending debit card transactions or deposits can be deducted when determining whether to assess a fee.

85. Plaintiff and Class members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the Account Agreement, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct.

86. Defendant breached the express and implied terms of the Account Agreement and Fee Schedule by, *inter alia*, assessing multiple NSF fees for the same electronic item, and by assessing overdraft or NSF fees when there was more than a "negative balance" in the account to cover the transaction or transactions at issue.

87. As a proximate result of Defendant's breach of contracts, Plaintiffs and Class members have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer for Relief set forth below.

**SECOND CAUSE OF ACTION**
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

#11221105.2

88.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

89.    Plaintiff and each of the Class members entered into contracts with Defendant covering the subject of overdraft transactions, which has been identified herein as the Account Agreement contract which covers overdraft fees and NSF fees, as well as the Fee Schedule as a related document.  The contracts were drafted by and are binding upon Defendant.

90.    In the contracts, Pentagon Federal promised that it would only assess "a fee" (singular) when it determined a member did not have enough money in his or her account to cover an "item," not multiple NSF "fees" for the same "item." In the Fee Schedule it stated the NSF fee would be "per item," not "per each presentment of an item."  Defendant also promised that it would only assess overdraft or NSF fees when there was a "negative balance."

91.    Further, good faith is an element of every contract.  Whether by common law or statute, all contracts impose upon each party a duty of good faith and fair dealing.  Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain.  Thus, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.  Evading the spirit of the bargain and abusing the power to specify terms, constitute examples of bad faith in the performance of contracts.

92.    The material terms of the contracts therefore included the implied covenant of good faith and fair dealing, whereby Defendant covenanted that it would, in good faith and in the exercise of fair dealing, deal with Plaintiffs and each Class member fairly and honestly and do nothing to impair, interfere with, hinder, or potentially injure Plaintiffs' and Class members' rights and benefits under the contracts.

93.    Plaintiffs and Class members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the contract, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct.

94.    Defendant breached the implied covenant of good faith and fair dealing based, *inter alia*, on its practices of assessing multiple NSF fees for the same electronic item, and of assessing fees when there was more than a "negative balance" in the account.  Defendant could easily have avoided acting in this manner by simply changing the programing in its software to charge only an NSF "per item" as its own Fee Schedule stated it would do, and to charge overdraft fees and NSF fees only when there really was a "negative balance" as its account agreement stated.  Instead, Defendant unilaterally elected to and did program its software to create accounting gimmicks which would maximize its overdraft and NSF fees.   In so doing, and in implementing its overdraft and NSF fee programs for the purpose of increasing and maximizing overdraft fees, Defendant executed its contractual obligations in bad faith, depriving Plaintiffs and Class members of the full benefit of the contracts.

95.    As a proximate result of Defendant's breach of the implied covenant of good faith and fair dealing, Plaintiffs and Class members have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer for Relief set forth below.

### THIRD CAUSE OF ACTION
### (Unjust Enrichment/Restitution)

96.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

97.    As a result of the wrongful misconduct alleged above, Defendant unjustly received millions of dollars in overdraft and NSF fees.

98.     Because Plaintiffs and Class members paid the erroneous overdraft and NSF fees and repeat NSF fees assessed by Defendant, Plaintiffs and Class members have conferred a benefit on Defendant, albeit undeservingly.  Defendant has knowledge of this benefit, as well as the wrongful circumstances under which it was conveyed, and yet has voluntarily accepted and retained the benefit conferred.  Should it be allowed to retain such funds, Defendant would be unjustly enriched.  Therefore, Plaintiffs and Class members seek relief as set forth in the Prayer for Relief set forth below.

## FOURTH CAUSE OF ACTION
### (Money Had and Received)

99.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

100.     Defendant has obtained money from Plaintiffs and Class members by the exercise of undue influence, menace or threat, compulsion or duress, and/or mistake of law and/or fact.

101.     As a result, Defendant has in its possession money which, in equity, belongs to Plaintiffs and Class members, and thus, this money should be refunded to Plaintiffs and  Class members.  Therefore, Plaintiffs and Class members seek relief as set forth in the Prayer for Relief set forth below.

## FIFTH CAUSE OF ACTION
### (Violation of Electronic Fund Transfers Act (Regulation E)
### C.F.R. § 1005 *et seq.*  (authority derived from 15 U.S.C. § 1693 *et seq.*))

102.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

103.     To the extent that Defendant had a Regulation E overdraft fee program in place, by charging overdraft fees on ATM and nonrecurring transactions, Defendant  violated Regulation E (12 C.F.R. §§1005 *et seq.*), whose "primary objective" is "the protection of consumers" (§1005.1(b)) and which "carries out the purposes of the [Electronic Fund Transfer

Act (15 U.S.C. §§1693 *et seq*.), the "EFTA"] (§1005.1(b)), whose express "primary objective" is also "the provision of individual consumer rights" (15 U.S.C. §1693(b)).

104.    Specifically, to the extent it operated a Regulation E overdraft program, the charges violated what is known as the "Opt In Rule" of Reg E. (12 C.F.R. §1005.17.) The Opt In Rule states: "a financial institution ... *shall not assess a fee or charge* ... pursuant to the institution's overdraft service, *unless* the institution: (i) [p]rovides the consumer with a notice in writing [the opt-in notice]... *describing the institution's overdraft service*" and (ii) "[p]rovides a reasonable opportunity for the consumer to *affirmatively consent*" to enter into the overdraft program (*Id.*) The notice "shall be clear and readily understandable." (12 C.F.R. §205.4(a)(1).) To comply with the affirmative consent requirement, a financial institution must provide a segregated description of its overdraft practices that is accurate, non-misleading and truthful and that conforms to 12 C.F.R. § 1005.17 prior to the opt-in, and must provide its customers a reasonable opportunity to opt-in after receiving the description. The affirmative consent must be provided in a way mandated by 12 C.F.R. § 1005.17, and the financial institution must provide confirmation of the opt-in in a manner that conforms to 12 C.F.R. § 1005.17.

105.    The intent and purpose of this Opt-In Contract is to "assist customers in understanding how overdraft services provided by their institutions operate .... by explaining the institution's overdraft service ... in a clear and readily understandable way"—as stated in the Official Staff Commentary (74 Fed. Reg. 59033, 59035, 59037, 5940, 5948), which is "the CFPB's official interpretation of its own regulation," "warrants deference from the courts unless 'demonstrably irrational,'" and should therefore be treated as "a definitive interpretation" of Reg E. *Strubel v. Capital One Bank (USA)*, 2016 U.S. Dist. LEXIS 41487, *11 (S.D. N.Y. 2016) (quoting *Chase Bank USA v. McCoy*, 562 U.S. 195, 211 (2011)) (so holding for the CFPB's Official Staff Commentary for the Truth In Lending Act's Reg Z).

106.    Pentagon Federal failed to comply with Regulation E, 12 C.F.R. § 1005.17, which requires affirmative consent before a financial institution is permitted to assess overdraft fees against customers' accounts through an overdraft program for ATM and non-recurring debit card

transactions. Pentagon Federal has failed to comply with the 12 C.F.R. § 1005.17 opt-in requirements, including failing to provide its customers with a valid description of the overdraft program which meets the strictures of 12 C.F.R. § 1005.17. Pentagon Federal's opt-in method fails to satisfy 12 C.F.R. §1005.17 because, *inter alia*, the Account Agreement states that an overdraft occurs when there is a "negative balance" in the account to cover a transaction but Pentagon Federal pays it anyway, when in fact Pentagon Federal assesses fees when there is enough money in the account to pay for the transaction at issue.

107.    As a result, Pentagon Federal has harmed Plaintiff and the members of the Class.

108.    Due to Pentagon Federal's violation of Regulation E (12 C.F.R. § 1005.17), Plaintiffs and the members of the Class are entitled to recover actual and statutory damages, as well as attorneys' fees and costs of suit.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the members of the Class pray for judgment as follows:

1.    For an order certifying this action as a class action in accordance with Rule 23;

2.    For compensatory damages on all applicable claims and in an amount to be proven at trial;

3.    For an order requiring Defendant to disgorge, restore, and return all monies wrongfully obtained together with interest calculated at the maximum legal rate;

4.    For statutory damages;

5.    For an order enjoining the wrongful conduct alleged herein;

6.    For costs of bringing suit;

7.    For pre-judgment and post-judgment interest as provided by law;

8.    For attorneys' fees under the Electronic Fund Transfer Act, the common fund doctrine, and all other applicable law; and

9.     For such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs and the members of the Class demand a trial by jury on all issues so triable.

Dated: March 12, 2020                Respectfully submitted,

WILENTZ, GOLDMAN & SPITZER, P.A.

By____*Kevin P. Roddy*_____
                KEVIN P. RODDY – VSB No. 22364
90 Woodbridge Center Drive, Suite 900
Woodbridge, NJ  07095
Telephone:  (732) 636-8000
Facsimile:  (732) 726-6686
E-mail:  kroddy@wilentz.com


Richard D. McCune, CA Bar No. 132124*
MCCUNE • WRIGHT • AREVALO LLP
3281 East Guasti Road, Suite 100
Ontario, CA  91761
Telephone:  (909) 557-1250
Facsimile:  (909) 557 1275
E-mail:  rdm@mccunewright.com

Taras Kick, CA Bar No. 143379*
taras@kicklawfirm.com
THE KICK LAW FIRM, APC
815 Moraga Drive
Los Angeles, CA  90049
Telephone:  (310) 395-2988
Facsimile:  (310) 395-2088
taras@kicklawfirm.com

\**Pro Hac Vice* applications to be submitted in
accordance with Local Civil Rule 83.1

**Attorneys for Plaintiffs and the Members of the
Proposed Class**